IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **STEPHANI DAWN PIPER**, ) | |
| on behalf of B.M.P., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 2:12cv1712 |
| ) | **Electronic Filing** |
| **MICHAEL J. ASTRUE,** ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## OPINION

## I.    INTRODUCTION

Stephani Dawn Piper ("Plaintiff") brings this action on behalf of her minor daughter ("B.M.P.") pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying B.M.P.'s application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f (the "Act"). This matter is before the court on cross motions for summary judgment. (ECF Nos. 11, 14). The record was developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment will be granted to the extent it seeks a remand for further proceedings consistent with this opinion and Defendant's Motion for Summary Judgment will be denied.

## II.    BACKGROUND

B.M.P. was born on April 4, 2001 and was 10 years of age at the time of the hearing. B.M.P. suffers from and has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), Gastroesophageal Reflux Disease ("GERD"), and Cyclothymic Disorder ("CD"). (R.

at 16-25).[1] In addition to these three impairments, she also had been diagnosed with a myriad of other ailments including anxiety disorder, benign heart murmur, chronic motor or vocal tic disorder, duodentitis, enuresis, esophagitis, fatigue, insomnia, lactose intolerance, night terrors, oppositional defiance disorder, and somnambulism. (R. at 16-25).

## A. Medical Records

B.M.P. was diagnosed with ADHD on September 26, 2007 by Sara C. Hamel, MD of Children's Hospital of Pittsburgh. B.M.P. was referred to Dr. Hamel by her primary care physician (PCP), James P. Mortimer, M.D., following Plaintiff's receiving a call from B.M.P.'s kindergarten teacher about her difficulties with focusing and paying attention in class. (R. at 148-50, 191). In her evaluation notes, Dr. Hamel highlighted B.M.P.'s difficulties in paying attention to tasks, finishing class work on time and staying focused. (R. at 149). Dr. Hamel also had B.M.P. complete a Kaufman Survey of Early Academic and Language Skills test (K-SEALS), wherein B.M.P. scored moderately for signs of ADHD, and had Plaintiff complete a Connor's Parent Rating Scale, wherein B.M.P. scored very high for signs of ADHD. (R. at 149). Taking into account this information, Dr. Hamel noted that while B.M.P. did not exhibit any major symptoms of ADHD, B.M.P. did display nervousness, irritability, and her behavior was consistent with a diagnosis of an ADHD combined subtype. (R. at 149). Dr. Hamel prescribed 18mg Concerta and recommended medication management along with behavioral management at school in the form of a 504 Plan. (R. at 149).

During an October 18, 2007 medication recheck, Dr. Mortimer noted B.M.P.'s ADHD symptoms decreased with medication, but increased her dosage of Concerta from 18mg to 27mg because he suspected she "may be metabolizing the medication very quickly." (R. at 186). In a

---

[1] Citations to the Record (ECF No. 6) will be referred as " R. at __."

subsequent June 11, 2008 medication recheck, Plaintiff reported B.M.P. did well on medication and her grades had improved from the Cs and Ds range to the As and Bs range. (R. at 186). Dr. Mortimer refilled B.M.P.'s prescription of Concerta at 36mg. (R. at 186).[2]

Dr. Mortimer increased B.M.P.'s Concerta prescription again on February 11, 2009, from 34mg to 54mg, after Plaintiff reported B.M.P. still could not stay focused in class. (R. at 178). Dr. Mortimer also prescribed Bactroban to treat "scabbed postules on left hand and forearm." (R. at 178). On August 27, 2009, at B.M.P.'s 8-year physical, Dr. Mortimer noted that B.M.P. did well in school, had positive teacher feedback, enjoyed reading, and was usually well regarded by peers. (R. at 174-78). Dr. Mortimer refilled B.M.P.'s Concerta at 54mg and added a booster dosage of 10mg of Ritalin to help with afternoon homework. (R. at 171-74).

In the 2007 to 2009 timeframe B.M.P. also was diagnosed and treated for several other medical conditions. On March 27, 2008, B.M.P. was seen by Prapti M. Kanani, M.D. for evaluation of a potential heart murmur. (R. at 182-84). B.M.P. was diagnosed with an "innocent heart murmur," with no exercise activity restrictions or cardiology follow-ups required. (R. at 182-84).

During an August 11, 2009 visit to Dr. Mortimer, B.M.P. complained of constant abdominal pain that had lasted several weeks. (R. at 176-77). Dr. Mortimer noted that while B.M.P.'s pain was alleviated by "tums," B.M.P. had a strong family history of GERD. (R. at 177). Dr. Mortimer prescribed Omeprazole 20mg for this condition. (R. at 177). In a follow-up evaluation at Children's Hospital on April 1, 2010, Amy Williams, LPN, discussed B.M.P.'s symptoms of GERD in the form of vomiting, abdominal pain, acid reflux and difficulty maintaining sleep throughout the night. (R. at 151-60). Although B.M.P.'s vomiting seemed to

---

[2] The record does not indicate when Dr. Mortimer increased B.M.P. from 27mg to 36mg Concerta.

be well controlled by 20mg of Prilosec which had been started 6 weeks prior, Nurse Williams recommended B.M.P. undergo a full blood-work panel and return for a check-up in four months. (R. at 155). Nurse Williams' report was signed by Ram Chandra, M.D. (R. at 156).

On May 17, 2010, B.M.P. presented to Dr. Mortimer with complaints of urinating herself constantly for a period of one week and unspecified constipation. (R. at 164). Dr. Mortimer recommended using Miralax, an over the counter laxative, and directed Plaintiff to contact him if B.M.P.'s conditions did not improve in 48 hours. (R. at 164).

Two weeks after B.M.P.'s most recent visit to Dr. Mortimer, Plaintiff filed an application with the Commissioner for SSI. (R. at 93-99). She supplemented that application with a function report. (R. at 116-25). In that report Plaintiff described B.M.P.'s difficulties by answering "no" to the following "does your child" inquiries: deliver phone messages, explain why he or she did something, use conditional sentences, read capital and small letters of the alphabet, add and subtract numbers over 10, understand money and make correct change, tell time, get along with you or other adults, get along with teachers, play team sports, pick up and put away toys, hang up clothes, perform household chores, accept criticism and correction, and finish things he or she starts. (R. at 119-24).

On June 21, 2010, B.M.P.'s application was reviewed by Edward Zuckerman, Ph.D., and Rama Kumar, M.D., on behalf of the Administration. (R. at 235-40). In finding B.M.P. suffered "marked" limitations in the domain of "Attending and Completing Tasks," the review team reasoned "[s]chool has not provided records but information is available in records of Dr. Mortimer and CHP evaluation in 9/07. She has responded well to meds and grades are at least adequate. She has a Title 15 agreement but no IEP." (R. at 237). In finding B.M.P. suffered "less than marked" limitations in the domain of "Health and Physical Well-Being," the review team proffered the following:

9 year old female was diagnosed with Reflux Esophagitis, GERD, gastritis, Functional heart murmur, chronic abdominal pain. 3-08=Heart= grade 2-6 systolic murmur at the left sterna border. Lungs=clear, Abdomen=soft, NT, ND, no masses. Neurologically and developmentally appropriate for age. 4-10=EGD= Gastritis, Duodenitis, Esophagitis.

(R. at 238). The review team found "no limitation" in the four other domains. (R. at 237-38).

On August 23, 2010, B.M.P. reported to Family Counseling Center of Armstrong County ("Family Counseling") for an intake evaluation. (R. at 280-83). In providing a historic overview, Plaintiff noted B.M.P.'s difficulty sleeping stemming from night-terrors, difficulty staying on task and doing homework, general poor grades, and physical tics such as skin picking at scabs. (R. at 280-83). Plaintiff further described a long family history of behavior problems with all of her children. (R. at 280-83). She also noted that her husband was disabled stemming from a serious car accident leading to open heart surgery. (R. at 281). She described B.M.P. as being her "daddy's baby," and noted that the B.M.P. was often worried about her father's health. (R. 281). Regarding B.M.P.'s ADHD treatment, she emphasized that these had only been minimally successful with medication because it only provided "short term minimal positive effects." (R. at 280, 282).

B.M.P. received an initial psychiatric evaluation at Family Counseling on November 10, 2010 by Mahendra L. Patil, M.D. (R. at 285-89). The evaluation noted that B.M.P. was referred to the agency by Dr. Mortimer due to only a "partial response" to her ADHD medication regimen. (R. at 285). Evaluating her overall limitations, Dr. Patil assigned B.M.P. a GAF score of 65.[3] (R. at 288). Dr. Patil's recommendation was to add Strattera 10mg with an increase to

---

[3] A global assessment of functioning ("GAF") score is used to report an individual's overall level of functioning with respect to psychological, social, and occupational functioning. The GAF scale ranges from 1 to 100 and measures psychological, social, and occupational functioning on a hypothetical continuum of mental health. The GAF scale is divided into ten ranges of functioning. A GAF rating is within a particular decile if either the symptoms severity or the

18mg in two weeks if B.M.P.'s response was limited. She also prescribed 3mg melatonin before bed to counter B.M.P.'s difficulty sleeping. (R. at 288).

B.M.P. was seen on March 3, 2011 for a GERD follow-up appointment with Dr. Chandra. (R. at 269-273). Dr. Chandra described B.M.P. as "doing well if on meds," with instructions to continue Prilosec twice daily and 30 minutes prior to meals, and to continue a low-fat anti-reflux and lactose restricted diet. (R. at 269-73).

In a March 16, 2011 medicine management visit at Family Counseling, Plaintiff complained of B.M.P.'s low grades, constant distraction, excessive talking, and significant difficulty falling asleep. (R. at 290-93). Despite adding Strattera Plaintiff reported that B.M.P. continued to experience ADHD side-effects at home and school. (R. at 290-93). Dr. Patil increased B.M.P.'s Strattera to 18mg; added Focalin 10mg, Focalin XR 20mg, and Remeron 15mg for ADHD; and discontinued Concerta, Ritalin and Melatonin "due to [only] a partial response at the maximum dose." (R. at 292). Dr. Patil again assessed B.M.P. with a GAF score of 65. (R. at 292).

On April 15, 2011, B.M.P. was seen at UPMC Western Psychiatric Institute and Clinic ("WPIC") by Christine Hoover, MSN for a psychiatric evaluation. (R. at 312-23). B.M.P. had

---

level of functioning falls within the range. Diagnostic and Statistical Manual of Mental Disorders (DSM IV-TR) 32-34 (4th ed. 2000). A GAF score of 65 falls within the GAF scale category of 61-70, indicating: "[s]ome mild symptoms…OR some difficulty in social, occupational, or school functioning, … but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 34.

The Diagnostic and Statistical Manual of Mental Disorders recently was updated in 2013. The fifth edition notes that while the GAF scale was included in the fourth edition, it was not included in the new edition out of concerns of "conceptual lack of clarity [ ] and questionable psychometrics in routine practice." DSM-5 at 16. While it is important to recognize ongoing refinements to the diagnoses of mental illnesses, it also is appropriate to cite the previous edition of DSM, which was current at the time Dr. Patil assigned GAF scores to the B.M.P. and more accurate a source than one that was not used by the treatment provider. For this reason we decline the invitation to consult the resource cited in plaintiff's brief – the website, Wikipedia.com. (ECF 12 at 48).

been referred to WPIC by her father's counselor for evaluation of a possible bi-polar disorder. (R. at 312). Plaintiff described to Nurse Hoover B.M.P.'s pro-longed mood swings, which lasted from one and a half to two and a half weeks on average. (R. at 312). She also noted B.M.P.'s hyperactivity, impulsiveness, bedwetting, recklessness, silliness, fearfulness and anxiety. (R. at 312-13). Based upon these and other behaviors, Nurse Hoover opined that B.M.P. met the criteria for Cyclothymic Disorder, ADHD, Anxiety Disorder, Enuresis, and Chronic Motor or Vocal tic Disorder, and assigned a GAF score of 55.[4] (R. at 321). She did not believe, however, that B.M.P.'s hypomania and depression were severe or long enough to diagnose her with Bi-Polar Disorder. (R. at 321). To assess B.M.P.'s baseline, Nurse Hoover gave instructions to discontinue all medications which targeted ADHD and for B.M.P. and her parents to assess medication efficacy and complete mood diaries. (R. at 322-23). This plan was approved by Boris Birmaher, MD. (R. at 324-27).

During a May 6, 2011 treatment plan review at Family Counseling, Plaintiff reported that B.M.P. had been diagnosed with Bi-Polar Disorder by WPIC. (R. at 305). She indicated there had been significant changes in B.M.P.'s mood, behavior and focus after B.M.P. had been taken off stimulant medications. Plaintiff noted that B.M.P. quit picking her skin, she was more outgoing and assertive with peers, and she did not have any temper tantrums. (R. at 305). Despite these apparent improvements, B.M.P. was still experiencing "manic moods" lasting approximately 2 weeks at a time. Plaintiff indicated she wanted B.M.P. to "learn mind calming skills to deal with racing thoughts and to continue to work on anxiety about dad's illness." (R. at 305).

---

[4] A GAF score of 55 falls within the GAF scale category of 51-60, indicating: "[m]oderate symptoms…OR moderate difficulty in social, occupational, or school functioning…" DSM IV-TR at 34.

On a follow-up appointment with Dr. Birmaher at WPIC on May 16, 2011, Plaintiff also reported positive results from taking B.M.P. off stimulant medications. (R. at 328). Dr. Birmaher's recommendation was to continue B.M.P. without medication and to have plaintiff gather more information on B.M.P.'s moods, including videotaping B.M.P. when she was in a hyper mood. (R. at 329-30).

Two days later on May 18, 2011, B.M.P. saw Dr. Patil for a medical management review at Family Counseling. The treatment report indicated that while B.M.P. had been taken off Focalin XR due to skin picking and being emotional, B.M.P. was compliant with and still taking a medication regimen of Strattera 25mg, Remeron 15mg, and Prilosec 20mg. Dr. Patil increased B.M.P.'s Strattera and noted that if conditions did not improve prescriptions for Abilify or Zyprexa would be added. (R. at 296).

On a June 10, 2011, Dr. Patil noted there was no clinical benefit on Strattera 25mg, that B.M.P. continued to be "hyperactive with a lot of other ADHD features," and "she may have bipolar features as she has mood swings." (R. at 298). Dr. Patil assigned a GAF score of 60,[5] increased the Strattera to 40mg, and noted that if B.M.P. partially responded to the increase in Strattera, she would add a small does of Adderall. (R. at 300).

At a follow-up medical management appoint on July 25, 2011 it was reported that for the "two weeks that she was on Adderall, she was picking her skin to the point of bleeding and was also crying inconsolably and had low appetite."[6] (R. at 331). A GAF score of 62 was assigned and Dr. Patil gave instructions to hold the Strattera and Remeron, and start Kapvay 0.1mg, a non-

---

[5] *See supra* Fn. 6.
[6] The treatment report notes B.M.P. was receiving 10mg of Adderall at the time, but it is unclear when or by whom Adderall was prescribed.

stimulant medication for treatment of ADHD. (R. at 333). Dr. Patil did not give instructions to increase, lower, or halt the 10mg of Adderall. (R. at 333).

Dr. Patil completed a Childhood Disability Evaluation Form for B.M.P. on July 27, 2011. In that form she summarized B.M.P.'s impairments as: "[s]ignificant difficulty staying focused, inattentive, impulsive, intrusive, impatient, poor frustration tolerance. Academic and social difficulties. Mood swings are marked." (R. at 306). Dr. Patil checked the box for "meets listing," but did not fill in the blank indicating which listing B.M.P. met. (R. at 306). Dr. Patil's explanation for checking the "meets listing" box was: "academic struggle, inability to complete tasks, social difficulty, disruption at home." (R. at 306). Dr. Patil also checked the box for "functionally equals the listings." (R. at 306). To support that assessment she indicated B.M.P. suffered "marked" limitations in the first three domains. In domain one, "Acquiring and Using Information," she explained: "Academic struggle. Needs repeated instruction and redirections. Instruction must be simple for her to carry out the direction." (R. at 308). In domain two, "Attending and Completing Tasks," she explained: "Difficulty staying focused on a task, especially if it requires sustained attention/effort and if it is repetitive, [o]ften the task is left unfinished." (R. at 308). In domain three, "Interacting and Relating With Others," she explained: "Impatient, impulsive, distractible, hyperactive, cutting people off, moods swings, unpredictable – leading to conflict in relationships and inability to make/keep friends." (R. at 308). Dr. Patil further indicated that B.M.P. suffered "less than marked" limitations in domains four, five and six, without further explanation. (R. at 309).

The last medical management appointment with Dr. Patil in the record took place on August 31, 2011. (R. at 335-38). Dr. Patil noted minimal improvement from the current medication even though there did not appear to be any negative side effects from it. (R. at 336). Dr. Patil's specific plan was to start back on Concerta at 18mg, which could be "increased to

30mg if no benefit and she tolerates it well," restart Remeron 15mg, cut back on Kapvay, and return for a follow-up appointment in one month. (R. at 337).

## B.     School Records

On October 23, 2007, B.M.P. received a 504 School Service Agreement ("504 Plan") from the Karns City Area School District for the 2007-2008 school year. (R. at 102-03). The agreement afforded B.M.P. several accommodations/modifications to her educational environment including prompting to refocus, cueing to stay on task, preferential seating, relaxed time elements, repeated directions, extra time for tests, and the option to complete tests and work in a less distractive setting. (R. at 102). B.M.P.'s 504 Plan was renewed on September 23, 2008, July 23, 2009, and on September 1, 2010.  (R. at 136-38, 105-06, 133-35).

B.M.P.'s only grades entered into the record are from the first three quarters of her 2010-2011 fourth grade year. (R. at 139). She received the following grades for those quarters: English 75/C, 95/A and 87/B; Spelling 102/A, 99/A and 101/A; Art 95/A, 92/A and 92/A; Music 97/A, 96/A, and 91/B; Reading 86/B, 88/B and 83/C; Social Studies 79/C, 80/C and 84/B; Math 89/B, 85/B and 89/B; Physical Education 100/A, 100/A and 100/A; and, Science 75/C, 77/C and 79/C.[7] (R. at 139).

## C.    Hearing Testimony

At the August 3, 2011 administrative hearing, B.M.P. testified she does poorly in school. (R. at 35). B.M.P. believes she gets along with her classmates but not her teachers, "because of [her] meds." (R. at 37). Her teachers get angry with her when she asks for Band-Aids after picking her skin, and the teacher must take her to the nurse if the teacher is out of Band-Aids. (R.

---

[7] The Karns City Area Elementary Schools Grade Report provides the following numerical to letter grade equivalencies: 00 to 59 equals an "F"; 60 to 69 equals a "D"; 70 to 83 equals a "C"; 84 to 91 equals a "B"; and 92 to 100+ equals an "A." (R. at 139).

at 39). She gets in trouble when she does not stay in her seat and when she gets distracted in class. (R. at 39). Her favorite subjects are art and gym; she does not like social studies. (R. at 40). Although she sometimes gets distracted from her homework, she typically can complete it with the help of her mother. (R. at 36).

B.M.P. indicated she does not get along with her brothers and they are always fighting. (R. at 39). When B.M.P.'s oldest brother is put in charge, B.M.P. is more likely to act out because she does not like to listen to him. (R. at 40). B.M.P. has stomach pains once per week in the evening. The pain is alleviated by medication. (R. at 38). Although the medication for her ADHD does not change the way she feels, when prompted about whether the medication "makes her feel good or no?[,]" she responded "no." (*Compare* R. at 37 *with* R. at 42). B.M.P. claimed that while she does have nightmares, she did not have any problems sleeping at night. (R. at 42).

Plaintiff corrected B.M.P. and stated that she suffers from insomnia and takes medication for that disorder. (R. at 43). With the medication she can sleep a few hours a night. (R. at 43). B.M.P.'s gastrointestinal problems have improved over time. (R. at 43). It is her understanding that B.M.P. has been diagnosed with "Bipolar, and ADHD, and oppositional defiance, and anxiety disorder." (R. at 43). Specifically, B.M.P. was diagnosed with Bi-Polar Disorder in May 2011 by WPIC. (R.at 44). This change in diagnosis primarily was based upon B.M.P.'s "wild mood swings," which quickly turn from one extreme to another. (R. at 44).

Plaintiff reported that B.M.P. struggles in school with any class that is not a fun elective, with grades in the "Low Cs to mid-Bs. Sometimes Ds and Fs, depending on the subject." (R. at 46). B.M.P. has problems with school staff and other adults - "the oppositional defiant disorder comes out a lot when she's in the presence of authority figures." (R. at 46). Plaintiff claims it takes B.M.P. between 3-1/2 to 5-1/2 hours per night to complete her homework with plaintiff's assistance. (R. at 47-48).

Plaintiff indicated there have been many issues with B.M.P.'s medication. While some medications provide no relief for B.M.P.'s ADHD, on "Ritalin-based products, her anxiety gets worse, and that's when she starts picking and self-mutilating." (R. at 45). Before taking B.M.P. off prescription medications for ADHD, Plaintiff received calls from the teacher everyday, "sometimes twice a day, about, 'she wouldn't stay in her seat, she wouldn't listen, she was writing on her desk, she was fidgeting, she was picking wounds open,' that type of things." (R. at 49). But now B.M.P. is off this type of medication, she hopes these problems will not be an issue any longer. When taken off Ritalin-based products, B.M.P. stopped picking her skin/wounds. (R. at 48, 49).

Plaintiff stated B.M.P. fights constantly with her brothers. "[T]hey claim it's because she's annoying them." (R. at 48). B.M.P. "…treats everybody else like they're stupid, and the boys get very aggravated by that." (R. at 48). When Plaintiff testified that B.M.P. sleep walks and has night terrors every night, B.M.P. interrupted her and claimed that she did not sleep walk the previous night. (R. at 47). Despite this outburst, Plaintiff claimed sleepwalking is a problem and that B.M.P.'s doctors are unable to account for why it occurs. (R. at 47).

Plaintiff and her husband suffer from Bipolar disorder. (R. at 50). Plaintiff also noted in B.M.P.'s initial application for benefits that B.M.P.'s two siblings were "blind or disabled." (R. at 94).

### D. Procedural History

Plaintiff filed for SSI on May 25, 2010, claiming disability beginning on May 25, 2007. (R. at 93-99). The application was denied on July 16, 2010. (R. at 53-56). A hearing was held before Administrative Law Judge James J. Pileggi ("ALJ") on August 3, 2011 wherein both Plaintiff and B.M.P. testified. (R. at 4-19, 66-71). The ALJ issued his decision denying benefits on September 17, 2011. (R. at 10-29). On September 27, 2012, the Appeals Council issued a

decision denying the Plaintiff's request for review, making the ALJ's decision the final decision

of the Commissioner. (R. at 1-5). The instant action followed.

## IV.    ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's final decisions on disability claims is provided by

statute. 42 U.S.C. §§ 405(g)[8] and 1383(c)(3).[9]  Section 405(g) permits a district court to review

the transcripts and records upon which the determination of the Commissioner is based.

This Court's review is limited to determining whether the Commissioner's decision is

"supported by substantial evidence."  42 U.S.C. § 405(g);  *Burns v. Barnhart*, 312 F.3d 113, 118

(3d Cir. 2002).  Substantial evidence is defined as "more than a mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate" to support a conclusion.

---

[8] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[9] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

*Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a de novo review of the Commissioner's decision nor re-weigh the evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986) ("even where this court acting de novo might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). In other words, as long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

For a claimant under the age of eighteen to be eligible for SSI benefits under the Act, he or she must demonstrate the existence of a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(C)(i); 20 C.F.R. § 416.906. A three-step sequential analysis is used to determine if a child meets the requirements for benefits. 20 C.F.R. § 416.924.

The Commissioner must determine: (1) whether the child is engaging in substantial gainful activity; (2) if not, whether the child has an impairment or combination of impairments that is severe; and (3) if so, whether the child's severe impairment or combination of impairments meets or equals the criteria listed for disability in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; 20 C.F.R. §§ 416.924(a)-(d), 416.925.

If the child does not explicitly meet the criteria for a listed impairment, then the ALJ must determine if his or her severe impairment(s) are medically or functionally equivalent. 20 C.F.R. §§ 416.924(d) (1)-(2), 416.926, 416.926a. Medical equivalence will be found if the findings related to the child's impairment(s) are at least of equal medical significance to the criteria of an analogous listed impairment. 20 C.F.R. § 416.926(b)(1)-(4).

Functional equivalence may be found based upon an analysis of six general domains of functionality. 20 C.F.R. § 416.926a. The domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others, (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical wellbeing. 20 C.F.R. § 416.926a(b)(1)(i)-(vi).

When evaluating a child's degree of functioning in any domain, the Commissioner must explore the disparity in functioning between the child claimant and unimpaired children of approximately the same age. 20 C.F.R. §§ 416.924a(b)(3)(i), 416.924b(a)(1)-(2); *see* also Social Security Ruling ("SSR") 09–29 at *3 ("[t]he critical element in evaluating the severity of a

child's limitations is how appropriately, effectively, and independently the child performs age appropriate activities").

If a child has "marked" limitations in at least two or "extreme" limitations in at least one of the six domains, benefits are to be awarded. 20 C.F.R. § 416.926a(d). A "marked" limitation "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

## B.     The ALJ's Findings

At step one of the analysis the ALJ found that B.M.P. had not engaged in substantial gainful activity since May 4, 2010.  At step two the ALJ found that the B.M.P. had the severe impairments of ADHD, GERD and CD. (R. at 16).

At step three the ALJ first determined that B.M.P. did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (R. at 16). The ALJ then determined that B.M.P. did not have an impairment or combination of impairments that functionally equaled the severity of a listed impairment. (R. at 16). In making that determination the ALJ found that B.M.P. suffered "less than marked" limitations in five of the six domains and "no limitation" in the remaining one. (R. at 19-24).

For the first domain, "Acquiring and Using Information," which pertains to a child's ability to learn information and think about and use that information, the ALJ found B.M.P. suffered "less than marked limitations." The ALJ reasoned that despite the accommodations needed by B.M.P., the evidence in the record demonstrated that B.M.P. had achieved above-average grades in school, appeared to be reading at grade level, and had seen positive improvements from the discontinuation of her ADHD medications. (R. at 20).

16

For the second domain, "Attending and Completing tasks," which pertains to a child's ability to focus and maintain attention, and to begin, carry through and finish activities or tasks, the ALJ found that B.M.P. suffered "less than marked limitations." The ALJ noted that B.M.P. was able to achieve a modicum of success in the school environment with accommodations and help. (R. at 21).

For the third domain, "Interacting and Relating with Others," which pertains to a child's ability to initiate and respond to exchanges with other people, and to form and sustain relationships with family members, friends, and others, the ALJ found "less than marked limitations." The ALJ highlighted that (1) B.M.P. exhibited little difficulty interacting with adult care providers, (2) the record contained no adverse statements from B.M.P.'s teachers to support Plaintiff's claim of tension between B.M.P. and her teachers and (3) Plaintiff testified that B.M.P. has a number of friends and interacts adequately with them. (R. at 22).

For the fourth domain, "Moving About and Manipulating Objects," which pertains to a child's ability to move his/her body from one place to another, and to move and manipulate objects, the ALJ found that B.M.P. suffered no limitation. Plaintiff does not specifically contest this finding. (R. at 23; *cf.* ECF 12 at 10-11, 19, 30, 49).

For the fifth domain "Caring for Yourself," which pertains to a child's ability to maintain a healthy emotional and physical state, the ALJ found that B.M.P. suffered "less than marked" limitations. He noted plaintiff's testimony that B.M.P. is able to care for herself, even if she cannot pick up her own clothes, help around the house, or stay on task when performing chores. (R. at 24).

For the sixth domain, "Health and Physical Well-Being," which pertains to the cumulative physical effects of physical and mental impairments and their associated treatments

on a child's health and functioning, the ALJ found that B.M.P. suffered "less than marked" limitations. Plaintiff does not specifically contest this finding. (R. at 24; *cf.* ECF 12 at 10, 30).

**C.    Discussion**

Remand is proper in this matter because the ALJ failed to address and weigh the entirety of the medical evidence contained in the record.

An ALJ is required to review every medical opinion received. 20 C.F.R. § 404.1527(c). In rendering a disposition, the ALJ must consider and evaluate all of the medical evidence in the record. *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001).  While an ALJ need not comment or reference every treatment note, his or her decision must demonstrate that all of the medical evidence has been weighed and evaluated in reaching the disposition. *Id.*  And there is a particular need to do so and supply an adequate explanation of reasoning behind the conclusions where the record contains conflicting medical evidence. *Id.*  This analysis and assessment must be sufficiently specific to allow the reviewing court to decide whether the ALJ's determination is supported by substantial evidence. *Smith v. Barnhart*, 54 Fed. Appx. 83, 86 (3d Cir. 2002); *Burnett v. Commissioner of Social Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000). Without a proper explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Burnett*, 220 F. 3d at 121 (*citing Cotter v. Harris*, 642 F.2d 700, 05 (3d Cir.1981).

After reviewing the record, we find it impossible to determine whether the ALJ's finding that B.M.P. does not functionally equal the medical listings for the severe impairments of ADHD is supported by substantial evidence. In making this determination the ALJ cited the medical opinions of Dr. Patil and a state agency psychological consultant. (R. at 19). The ALJ gave little weight to the opinion of Dr. Patil, asserting that her opinion was "inconsistent with other substantial evidence of record, including Dr. Patil's own treatment notes." (R. at 19). The ALJ

gave little weight to the consultant, asserting that the opinion did not take into account the

Plaintiff's subjective complaints. (R. at 19). The ALJ failed to review, however, the medical

evidence from the physician who originally diagnosed B.M.P. with ADHD, Dr. Hamel and

B.M.P.'s primary care physician, Dr. Mortimer. (*Cf* R. at 10-29). Additionally, the ALJ failed to

review medical evidence from Dr. Birmaher and Nurse Hoover, both of whom observed and

treated B.M.P. for Bi-Polar and CD symptomology. (*Cf* R. at 10-29).

The court considers the ALJ's failure to review evidence from doctors Hamel, Mortimer,

and Birmaher and Nurse Hoover particularly troubling because that evidence makes up a large

portion of the record in this matter. When the ALJ assessed little weight to Dr. Patil's opinion

that B.M.P. suffered "marked" limitations in three domains, he did so under the premise that

there was substantial evidence to contradict her opinion. But, not only does the ALJ fail to

explain what substantial evidence contradicts her opinion, he failed to explicate and discuss the

medical evidence from the above doctors whose treatment of B.M.P. gives context to Dr. Patil's

treatment and understanding of B.M.P.'s medical impairments.

In particular, Dr. Hamel and Mortimer's treatment notes support and provide an

explanation for Dr. Patil's assessment of B.M.P.'s limitations. While Dr. Hamel summarized

B.M.P.'s ADHD as a static encephalopathy, which Dorland's Medical Dictionary defines as

degenerative disease of the brain with non-worsening manifestations,[10] the nervousness and

irritability she described B.M.P. as exhibiting have worsened overtime. (R. at 148-50).

Observing B.M.P.'s symptomology over a timespan of several years, Dr. Mortimer titrated her

dosage of ADHD medication Concerta from 18mg to 54mg, the maximum dosage. (R. at 178; *cf*

R. at 292 (dosing maximum)). Even at the maximum dosage Dr. Mortimer noted only a partial

---

[10] Dorland's Illustrated Medical Dictionary, 614-15 (32nd ed. 2011).

response to the medication and referred B.M.P. to Dr. Patil for more extensive assessment and treatment. (R. at 285).

Dr. Birmaher and Nurse Hoover's assessment of B.M.P. demonstrate B.M.P.'s ongoing struggle with her limitations. Despite her ADHD diagnosis and treatment, notes from Dr. Birmaher and Nurse Hoover draw attention to a possible corollary mental disorder affecting B.M.P.. Their April 15, 2011 treatment plan for B.M.P. included a clinical assessment for "1) if [B.M.P.] has Bipolar disorder, 2) If the Bipolar Disorder co-exists with ADHD, or if what was thought of as ADHD [symptoms] was subsyndromal [symptoms] of Cyclothymia or Bipolar disorder." (R. at 327).

Whatever else can be said about this planned course of treatment, it is clear that B.M.P.'s mental impairments and resulting limitations were not definitively diagnosed and brought under control through medication. To the contrary, the record clearly demonstrates the frustration of the treating and consulting specialist physicians to achieve the same. And while the record does not include the results of this treatment plan, or any indication as to whether a conclusion on those issues was reached, the ALJ failed to account for and discuss this aspect of the medical evidence. (*Cf.* R. at 10-29).

When coupled with the above, the ALJ's failure to consider and evaluate the medical evidence from doctors Hamel, Mortimer, Birmaher, and Nurse Hoover makes clear that the ALJ did not properly review the entirety of the record in determining B.M.P.'s disability. Given this error, remand to the Commissioner is appropriate for further consideration consistent with this Opinion.

Because we have determined that a remand is appropriate for the reasons discussed above, this Court need not resolve Plaintiff's challenge to the ALJ's credibility determination inasmuch as the ALJ may re-evaluate the credibility of B.M.P. and her mother in the course of

reconsidering the medical evidence. However, the Court notes that on remand the Commissioner

should strongly consider the severity of all B.M.P.'s impairments and the specific medical listing

requirements relevant to B.M.P.'s conditions. *See e.g.* 42 U.S.C. § 423 (d)(5)(A); *Green v.*

*Schweiker*, 749 F.2d 1066 (3d Cir. 1984) (The Act recognizes that under certain circumstances

the subjective reporting of limitations may in themselves be disabling); *Ferguson v. Schweiker*,

765 F.2d 31 (3d Cir. 1985) (setting forth a four-prong standard to be used by district courts when

reviewing assessments of the Commissioner based on subjective reports of significant

limitations: (1) subjective complaints are to be seriously considered, even where not fully

confirmed by objective medical evidence; (2) subjective complaints may support a claim for

disability benefits and may be disabling; (3) when such complaints are supported by medical

evidence, they should be given great weight; and finally, (4) where the claimant's testimony

about the reported limitation is reasonably supported by medical evidence, the ALJ may not

discount the limitation without contrary medical evidence); *Burnett v. Commissioner of Social*

*Security*, 220 F.3d 112, 122 (3d Cir. 2000) (in evaluating such limitations, an ALJ must accord

subjective complaints the same treatment as objective medical reports, in that he must weigh all

the evidence before him and explain his or her reasons for crediting and/or rejecting such

evidence.).

In addition, the ALJ must accord the subjective complaints properly attributed to B.M.P.

the same treatment as objective medical reports. *Burnett*, 220 F.3d at 122. In doing so serious

consideration must be given to those subjective complaints where a medical condition exists that

could reasonably produce such complaints. *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir.

1993). When medical evidence provides objective support for the subjective complaint, the ALJ

can only reject such a complaint by providing contrary objective medical evidence. *Mason*, 994

F.2d at 1067-68. Such evidence must be highlighted and evaluated in a manner that will permit

this court to determine that the ALJ has considered all of the medical and other probative evidence bearing of B.M.P.'s limitations and the resulting assessment and conclusions are supported by substantial evidence.

**V.      CONCLUSION**

Under 42 U.S.C. § 405(g), a district court may, at its discretion, affirm, modify or reverse the Secretary's final decision with or without remand for additional hearings.  Here, remand is warranted because the ALJ's decision is not supported by substantial evidence.

Date: March 20, 2014

                                                s/David Stewart Cercone
                                                David Stewart Cercone
                                                United States District Judge

 cc:    Katrine M. Erie, Esquire
        Christy Wiegand, AUSA


        (*Via CM/ECF Electronic Mail*)